934 F.2d 322
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Austin L. EVANS, Plaintiff-Appellant,
v.
CLEVELAND STATE UNIVERSITY BOARD OF TRUSTEES, et al.,
Defendants-Appellees.
 No. 90-3759.
 United States Court of Appeals, Sixth Circuit.
 June 3, 1991.
 
 Before RYAN and SUHRHEINRICH, Circuit Judges, and McRAE, Senior District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff, Austin L. Evans, appeals the summary judgment for defendants in this civil rights action under 42 U.S.C. Sec. 1983, claiming reverse discrimination in his denial of tenure and promotion. This appeal addresses whether the district court properly granted defendants' motion for summary judgment on the ground that Evans failed to produce evidence which raises a genuine issue as to whether defendants refused to grant him tenure based upon his race or, as to whether his equal protection rights were violated. For the following reasons, we affirm.
 
 I.
 
 2
 Evans, a white American male, filed this reverse discrimination action under 42 U.S.C. Sec. 1983 in January 1989 against the Cleveland State University Board of Trustees ("University") and twenty-eight University officials, alleging that he was treated differently from other candidates for tenure because of his race and national origin. Evans amended his complaint in March 1989 claiming that defendants also violated his Fourteenth Amendment right to equal protection by denying him tenure and promotion.
 
 
 3
 Evans was hired by the University in January 1982 as an instructor in the Department of Mechanical Engineering. In September 1984, after obtaining his doctorate degree in Mechanical Engineering, Evans was promoted to assistant professor. During the 1986-87 and 1987-88 academic years, he applied unsuccessfully for tenure and promotion to associate professor. This action arises out of the denial of the 1987-1988 application for tenure.
 
 
 4
 At Cleveland State, a tenure application is first reviewed by a personnel action committee composed of faculty members within the respective college. It is then reviewed by the department chairperson, and then by the dean. In turn, the dean makes a recommendation to the provost. If the recommendations of the personnel action committee, the chairperson, or the dean are in conflict, or if the provost declines to support a candidate having favorable recommendations, the provost refers the application to the university personnel committee, which is composed of eight tenured faculty members. The university personnel committee makes a recommendation to the provost who, in turn, makes a recommendation to the president of the University. The president recommends to the Board of Trustees the tenure applications he finds acceptable.
 
 
 5
 A candidate denied tenure may appeal to the faculty affairs committee which is composed of six faculty members. The faculty affairs committee reviews the application, invites the candidate to appear before it, and issues a written recommendation to the provost who in turn makes a final determination.
 
 
 6
 Tenure decisions are based upon the criteria set forth in sections 8.1.2. (a)(1) and 8.1.2. (a)(4) of the University Handbook. Section (a)(1) provides that to be appointed to the University's faculty, the teacher must demonstrate: the highest standards in teaching; a working commitment to creative achievement; an increased responsibility in professional service; and a commitment to acceptable professional ethics and academic responsibility. Section (a)(4.c) provides that:
 
 
 7
 [a]ppointment or promotion to the rank of associate professor is based on evidence that the candidate is a fully competent teacher. In addition, the candidate shall demonstrate significant scholarship beyond publication of material contained in his or her dissertation, or outstanding intellectual leadership beyond the University community or exceptional achievement as a teacher.
 
 
 8
 Evans' 1987-88 application was recommended by the personnel action committee, the chairman, and the dean. However, the dean, in his letter of recommendation to the provost, expressed concern that Evans' application had been given a cursory examination and that Evans' scholarship needed to "take[ ] on a more fundamental flavor." The provost determined that although Evans met the standards of teaching, service, and professional ethics, his scholarship was lacking because it was concentrated in "applied engineering" rather than "fundamental or theoretical engineering." Apparently, applied engineering is concerned with adapting an equation to the design of a product; whereas, fundamental engineering develops a theory mathematically to arrive at a certain equation. Most scholars prefer fundamental scholarship because applied scholarship is generally confidential work which is infrequently published and is less subject to critical evaluation.
 
 
 9
 Because of the dean's concern, the provost asked the university personnel committee to review Evans' application. The personnel committee agreed with the provost that Evans' scholarship was lacking and recommended that Evans' tenure application be denied. The provost and the president agreed with this recommendation, and Evans' application was not submitted to the Board of Trustees for its approval.
 
 
 10
 Evans unsuccessfully appealed to the faculty affairs committee. Thereafter, he resigned from his position, refusing the University's offer of a terminal contract and the opportunity to reapply for tenure in 1988.
 
 
 11
 Evans was one of four assistant professors in the College of Engineering to apply for promotion and tenure in 1987. The other three applicants, two whites and one Asian, were granted tenure. University-wide, Evans was one of sixteen assistant professors to apply for tenure. Ten whites, one black, and one Asian were promoted and given tenure; three whites, including Evans, and one Asian, were denied tenure. The College of Engineering had no black faculty members when Evans applied for tenure, and university-wide, only twenty-one out of approximately 535 full-time faculty members were black.
 
 
 12
 Evans filed this suit, alleging that the denial of his 1987-88 tenure application constituted reverse discrimination based upon race and a denial of his equal protection right not to be treated differently from others similarly situated. Defendants moved for summary judgment on the ground that Evans had not submitted evidence of discrimination.[1] The district court granted defendants' motion, finding that there was not a genuine issue as to whether race played a role in the University's decision not to grant Evans tenure, and that Evans failed to state an equal protection claim.
 
 II.
 A.
 
 13
 Evans claims the district court erred in holding that there was no genuine issue of fact as to whether he was discriminated against on the basis of race.
 
 
 14
 Both Title VII and section 1983 provide relief for discriminatory employment practices of public employers. Gutzwiller v. Fenik, 860 F.2d 1317, 1325 (6th Cir.1988). In a reverse discrimination case, the plaintiff must submit proof of background circumstances which support the suspicion that "the defendant is that unusual employer who discriminates against the majority," and proof that "the employer treated differently employees who were similarly situated but not members of the protected group." Murray v. Thistledown Racing Club, 770 F.2d 63, 67 (6th Cir.1985).
 
 
 15
 Additionally, in cases claiming a denial of tenure because of discrimination,
 
 
 16
 for a plaintiff to succeed ... the evidence as a whole must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university. Absent evidence sufficient to support a finding that such disagreements or doubts are influenced by forbidden considerations such as sex or race, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties and reviewing authorities.
 
 
 17
 Zahorik v. Cornell Univ., 729 F.2d 85, 94 (2d Cir.1984).
 
 
 18
 Once the plaintiff has demonstrated a prima facie case of discrimination, the defendant must come forward with a legitimate, nondiscriminatory reason for its action, after which the plaintiff bears the burden of proving that the proffered reason is pretextual. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252 (1981); Farber v. Massillon Bd. of Educ., 917 F.2d 1391, 1398 (6th Cir.1990), cert denied, 111 S.Ct. 952 (1991).
 
 
 19
 Assuming Evans has stated a prima facie case, defendants' articulated reason for denying Evans tenure is that Evans' scholarship was deficient. The evidence supporting this reason includes a letter from the provost to the university personnel committee requesting review of Evans' application. In this letter, the provost questioned Evans' scholarship, in particular, three publications which were technical progress reports, that is, "applied" articles. The provost was hesitant to credit this "confidential research" because the research was not "part of the open scientific interchange which must characterize the scholarship of university faculty members." The provost also questioned three other publications, characterizing them as "Proceedings," which "are by no means the rigorous equivalent of publishing in refereed journals." The provost also commented that out of the twenty-one publications that Evans included in his tenure application, only five publications were "refereed."
 
 
 20
 Defendants' evidence also includes a letter from the university personnel committee, in which the committee agreed with the provost that "[t]he nature of some of [Evans'] work, being confidential and not widely disseminated, limits the open exchange of ideas and opportunities for critical evaluation. This is certainly not equivalent to the international status of many recognized journals of most disciplines."
 
 
 21
 This court and other courts have found that deficient scholarship is a legitimate nondiscriminatory reason to deny tenure. Langland v. Vanderbilt Univ., 772 F.2d 907 (6th Cir.1985) (Table); see also Lynn v. Regents of the Univ. of Cal., 656 F.2d 1337, 1344 (9th Cir.1981), cert. denied, 459 U.S. 823 (1982). Consequently, we find that defendants have articulated a legitimate, nondiscriminatory reason for not promoting Evans, and to avoid summary judgment, Evans must demonstrate that defendants' rationale is pretextual. He may do this "either directly[,] by persuading the court that a discriminatory reason more likely motivated the employer or indirectly[,] by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.
 
 
 22
 Evans claims that defendants' reason is pretextual because he was treated differently from black professors as a result of a voluntary affirmative action plan promulgated by two of the defendants after public criticisms of the University's equal employment policy. Evans compares himself with a black associate professor in the College of Education, who was awarded tenure during the 1987-88 academic year, and with an untenured black associate professor, who was hired by the Department of Civil Engineering after Evans was denied tenure. Evans alleges that he was denied tenure even though his scholarship was as good as these other two black professors.
 
 
 23
 However, these comparisons are inappropriate because they do not raise to an inference of discrimination. As the Second Circuit noted in Zahorik, tenure decisions in academic settings involve a combination of factors which tend to set them apart from employment decisions generally:
 
 
 24
 First, tenure contracts entail commitments both as to the length of time and collegial relationships which are unusual.... Second, academic tenure decisions are often non-competitive.... Third, university tenure decisions are usually highly decentralized.... Fourth, the number of factors considered in tenure decisions is quite extensive.... Fifth, tenure decisions are a source of unusually great disagreement....
 
 
 25
 ... A denial of tenure by an English department simply cannot be compared with a grant of tenure in the physics or history departments. Even within a single department comparisons are difficult because the number of decisions within a particular period may be quite few, the decisions sometimes may be non-competitive and tenure files typically contain positive as well as negative evaluations, often in extravagant terms, sufficient to support either a grant or denial of tenure.
 
 
 26
 Zahorik, 729 F.2d at 92-93 (emphasis added).
 
 
 27
 Evans' comparison of a black associate professor in the College of Education and an untenured black associate professor in the Department of Civil Engineering is inappropriate. A denial of tenure by the Mechanical Engineering Department should not be compared with a grant of tenure in the College of Education or Department of Civil Engineering. In sum, Evans has not produced evidence sufficient to raise a genuine issue as to whether his race played a role in the University's refusal to grant him tenure. He has demonstrated only that his denial of tenure occurred in the context of disagreement about the scholarly merits of his academic work, which Zahorik specifically finds insufficient to support such a claim. Id. at 94. Therefore, we affirm the district court's grant of summary judgment to defendants.
 
 B.
 
 28
 Evans contends that he was treated differently from other professors who were similarly situated in violation of the Equal Protection Clause of the Fourteenth Amendment. He alleges that defendants did not apply the same standards in evaluating his scholarship as were used in evaluating the scholarship of three other tenured associate professors in the College of Engineering.
 
 
 29
 The Supreme Court has stated that in order to prevail on a claim of equal protection, there must be proof of discriminatory intent or purpose. Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977). Similarly, this court has held that the denial of a faculty promotion or tenure based upon an evaluation of a faculty member's scholarly achievements is not judiciable in a federal court under a civil rights statute without evidence of sex or race discrimination. Gutzwiller, 860 F.2d at 1331. We recognized that the Supreme Court has made clear that:
 
 
 30
 absent evidence of a constitutionally impermissible basis for a challenged academic decision--such as sex or race discrimination--courts and juries must be extremely reluctant to second guess the professional judgment of the academic decisionmakers. Only when the challenged decision is arbitrary and capricious, and without rational basis, may it be set aside upon judicial review.
 
 
 31
 Id. at 1331 (citing Regents of Univ. of Mich. v. Ewing, 474 U.S. 214 (1985)).
 
 
 32
 In Gutzwiller, we cited with approval the decision of Clark v. Whiting, 607 F.2d 634 (4th Cir.1979), wherein, the Fourth Circuit held that the alleged failure of the defendant university to apply the same standards in evaluating plaintiff's qualification for promotion as were used "in the past" was not reviewable by a federal court in a civil rights action based upon a denial of equal protection. Id. at 640.
 
 
 33
 This court is in no position to evaluate Evans' academic credentials and the quality of his published scholarship or to compare them with other professors' credentials and writings in a civil rights action alleging a denial of equal protection. Because Evans has afforded no justifiable case showing he is a member of a class that has suffered discrimination by the defendants in violation of the Equal Protection Clause of the Fourteenth Amendment, we affirm the district court's grant of summary judgment for defendants.
 
 
 34
 AFFIRMED.
 
 
 
 *
 The Honorable Robert M. McRae, Senior District Judge of the United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 The Board of Trustees moved to dismiss the complaint against it on sovereign immunity grounds under the Eleventh Amendment, which the district court granted. This issue is not appealed